James D. KEFFER; Beulah E. Chapman;
Paul Evert Cooper, for themselves and
all persons similarly situated, Plain-
tiffs–Appellees,

v.

H.K. PORTER COMPANY, INC.; Con-
nors Steel Company, a subsidiary of
H.K. Porter Company, Inc., Defen-
dants–Appellants,

and

Program of Hospital and Physicians'
Services Benefits, Defendant.

No. 88–2549.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 8, 1988.
Decided March 23, 1989.

William David Levine (Marshall and St.
Clair, on brief), for defendants-appellants.

William Thomas Payne (Duane F. Ice,
John G. Adam, Miller, Cohen, Martens &
Ice, P.C., Daniel P. McIntyre, James F.
Wallington, Hostler and Segal, on brief),
for plaintiffs-appellees.

Before ERVIN, Chief Judge, and WIDENER and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge:

H.K. Porter Company (Porter) appeals from a district court order granting a summary judgment which ordered Porter to reinstate all retiree medical and life insurance benefits that its wholly-owned subsidiary terminated at the expiration of the collective bargaining agreement it had with plaintiff-appellees' union. Plaintiff-appellees (Retirees), 319 former Connors Steel Company employees or their surviving spouses, brought this action for breach of the collective bargaining agreement under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and for violation of the employees' Welfare Benefit Plan and fiduciary duties under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. (ERISA). We conclude that the district court correctly determined that Connors' obligation to provide the terminated benefits survived the expiration of the collective bargaining agreement and that Porter was financially liable for the benefits' continuation. We therefore affirm.

I

In 1950, Porter acquired a steelmaking facility in Birmingham, Alabama known as Connors Steel Company (Connors) and established it as a separate division of Porter. In 1956, Porter bought another facility in Huntington, West Virginia, operating it as a "separate works" of the Connors Division. Nearly 20 years later, in 1974, Porter incorporated Connors as a wholly-owned subsidiary and has owned all of Connors' stock since that time. Before Connors' incorporation, Porter and the United Steelworkers of America (the Union) entered into collective bargaining agreements that covered Porter's employees. After Connors' incorporation, however, Connors and the Union negotiated a separate collective bargaining agreement, specifically covering Connors' employees, which specified that it would be renegotiated every three years. The health and life insurance benefits at issue here became a part of the parties' agreement in 1974.

In 1979, Connors experienced severe financial difficulty, necessitating structural change. Between 1982 and 1983, Connors closed both the Birmingham, Alabama plant and the Huntington, West Virginia plant, selling them shortly thereafter.[1] Connors stayed in operation as such until March of 1987 when it filed a Petition for Relief pursuant to Chapter 7 of the Bankruptcy Code.

When the Huntington plant was closing in 1982, Connors advised Retirees that their benefits would terminate on April 1, 1984, the date the parties' last collective bargaining agreement expired. Retirees sought a preliminary injunction against Connors and the company that provided the medical benefits, attempting to enjoin them from terminating the medical coverage. Retirees later amended their complaint, joining Porter as an additional defendant and alleging that, at all relevant times, Connors was operating as Porter's agent or alter ego, thus making Porter liable for Connors' obligations. After an evidentiary hearing, the district court denied Retirees' request for an injunction, holding that Connors lawfully terminated the benefits. On reconsideration, however, the district court vacated its earlier conclusions of law and entered a preliminary injunction against Connors, but held that Retirees were not entitled to comparable relief against Porter on the evidence then of record.

Approximately 18 months later, after Retirees filed their fourth amended complaint, the district court granted Retirees' motion for summary judgment, finding that both Connors and the Union intended the benefits to survive the expiration of the collective bargaining agreement and the cessation of Connors' operation. The court also held that Connors was Porter's agent or

---

1. Connors also terminated the Alabama retirees' benefits. The retirees sued, obtaining a judgment in their favor that was upheld on appeal. *See United Steelworkers of America, et al. v. Connors Steel Co. & H.K. Porter Co.*, 855 F.2d 1499 (11th Cir.1988).

alter ego, and that Porter was therefore liable for financing the continuation of the benefits. Porter appealed.

Porter and Retirees do not dispute the nature of the benefits granted under the agreement. The only issues before us then are whether the welfare and life insurance benefits were to continue beyond the expiration of the collective bargaining agreement, and, if they were, whether Porter is liable for their financing.

## II

■ In determining whether an employer's obligation to provide benefits to its retirees or their surviving spouses continues beyond the expiration of the collective bargaining agreement, we look to the parties' intent as expressed in their agreement. *District 29, United Mine Workers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir.1985). While the question therefore is primarily one of contract interpretation, *id.*, collective bargaining agreements are not interpreted under traditional rules of contract but under a federal common law of labor policy. *Bowen v. USPS*, 459 U.S. 212, 220, 103 S.Ct. 588, 592, 74 L.Ed.2d 402 (1983). Therefore, "[i]n order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." *Transportation–Communication Employees Union v. Union Pacific Railroad Co.*, 385 U.S. 157, 161, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966). Of course, as with any contract interpretation, we begin by looking at the language of the agreement for any clear manifestation of the parties' intent. *Royal Coal*, 768 F.2d at 590. "The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." *International Union, United Automobile, Aerospace & Agricultural Implement Workers v.*

*Yard–Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir.1983).

Following these principles, the district court concluded that Connors and Retirees, as represented by the Union, intended the benefits in question to extend beyond the expiration of the collective bargaining agreement. We agree.

First, the express language of the parties' collective bargaining agreement indicates that the benefits were to survive.[2] For example, the 1974 agreement—in which the benefits were first included—distinguished between benefits for "employees" and "pensioners." In relevant part, the agreement provided that

> [d]uring the life of this Agreement [Connors] will continue to provide group insurance coverage for employees without cost to them. Effective October 1, 1974, the Plan will be amended to include the additional benefits provided for in the May 1, 1974 Basic Steel Company Agreements.

The amended "additional benefits"—as distinguished from the employee life insurance coverage that remained in effect only for the life of the agreement—were clearly linked to eligibility for Medicare, rather than to termination of the parties' agreements.

> Effective October 1, 1975, for employees who retire on or after Sept. 30, 1974, on other than a deferred vested pension and for surviving spouses of (1) an employee who retires on or after Sept. 30, 1974 ... and (2) an employee who dies on or after [that date]; at a time when the employee is accruing continuous service and after he has completed 15 years of continuous service:
>
> a. [Connors] will establish a group insurance program to provide hospital benefits and physicians' services benefits coverage (in accordance with the attached specifications) for pensioners (and their eligible dependents) who are not eligible for Medicare and for indi-

**2.** Porter has stipulated that the Retirees' life insurance benefits—a $1500 cash benefit payable on death to all but disability retirees—were to continue beyond the expiration of the collective bargaining agreement. Porter only contests

its liability, as parent corporation, to continue paying the benefits for Connors. It is unnecessary then in this section to discuss the survival of these benefits; Porter's liability will be discussed later.

viduals (and their eligible dependents) who are receiving Surviving Spouse's benefits and who are not eligible for Medicare.

. . . .

c. [Connors] will pay the cost of such program coverage.

d. Participation in such program ... shall terminate when such person becomes eligible for Medicare.

As the district court recognized, when these provisions are read together, they clearly comprehend and apply to two separate categories of persons, with two corresponding classes of benefits and two expected periods of duration. Accordingly, "employees" were to receive group insurance coverage for the duration of the agreement, whereas "retirees," notwithstanding the agreement's expiration, were to receive the described medical coverage until they were eligible for Medicare.

This interpretation is further buttressed by the parties' later collective bargaining agreements that continued to expressly limit the employee coverage to the lives of the agreements without similarly limiting the retirees' medical coverage. The literal language of the parties' agreements therefore, strongly supports the district court's conclusion that the agreements can only be rationally interpreted as contractually obligating Connors to provide the Retirees' medical coverage beyond the expiration of the collective bargaining agreement. Porter argues, however, that this literal language is disputed by the language in the Preamble to Connors' Benefits Booklet so that its meaning is not "plain." The Preamble provides that the benefits program, as defined in the Booklet, constitutes a part of the Pensioners' and Surviving Spouses' Health Agreement (Health Agreement) "which continues until February 28, 1978, and thereafter, *subject to negotiations* between the Company and the Union." (Emphasis added.) Porter contends

that inclusion of the language "subject to negotiations" necessarily indicates that the Union and Connors anticipated that the benefits would terminate at the expiration of each current collective bargaining agreement, and would only become a part of the new agreement if the parties' renegotiations produced such a result. We disagree. Contrary to Porter's position, the language "subject to negotiations" does not necessarily suggest that, absent positive negotiation, the benefits would lapse. The more natural interpretation of the language is that, while the benefits continue "thereafter," the parties may renegotiate to alter them or perhaps eliminate them altogether. But such action requires bilateral participation in the alteration or elimination of the benefits; it does not allow for unilateral action as Porter contends. This latter interpretation is also fully consistent with the relevant provision in the Health Agreement to which the Preamble refers.[3] The provision reads that:

> Any pensioner or individual receiving a Surviving Spouse's benefit who shall be covered by the Program established by this Agreement shall not have such coverage terminated or reduced ... so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, *notwithstanding the expiration of this Agreement,* except as the Company and the Union may agree otherwise.

(Emphasis added.) From this language and the language contained within the collective bargaining agreement itself, it is clear that all of the parties concerned fully anticipated that the Retirees' benefits would continue beyond the expiration of their collective bargaining agreement—and even beyond cessation of Connors' operation. *Compare Royal Coal,* 768 F.2d at 590–91 (finding benefits did not continue where language read "benefits for ... Employees ... as well as pensioners ... shall

---

**3.** Although the Benefits Booklet specifically notes that the Health Agreement is attached to the Booklet, it never was. This does not suggest, however, that the terms of the Health Agreement were inoperative. Rather, all of the evidence suggests that the failure to attach the Agreement was no more than an oversight. Moreover, all of the parties were made aware of the existence of the Health Agreement's terms by the Booklet's express reference to the Agreement.

be guaranteed during the term of this Agreement") and *District 17, UMWA v. Allied Corp.*, 765 F.2d 412, 417 (4th Cir. 1985) (same).

There is also ample evidence in the record showing that Connors itself recognized its continuing obligation. When Connors' West Virginia plant was closing, various Connors' representatives told retiring employees that their benefits would continue until they reached Medicare age. A letter sent from Connors Industrial Relations Department to the Union related that "retirees and surviving spouses shall receive Blue Cross and Blue Shield in accordance with the provisions of hospital and physicians services benefits for eligible pensioners for [sic] surviving spouses not eligible for Medicare." And, finally, an informational handout given to Connors' employees interested in applying for retirement included the following clarification of the effect of retirement on insurance: "Blue Cross/Blue Shield: If not eligible for Medicare, continues (until attainment of Medicare eligibility); if eligible for Medicare, coverage discontinued."

As the district court recognized, then, both the language in the parties' agreements and the conduct of Connors' representatives indicate that the benefits at issue here were intended to continue beyond the expiration of the collective bargaining agreement. Such a determination is also consistent with a more far-reaching understanding of the context in which retiree benefits arise. Because benefits for retirees are permissive rather than mandatory subjects of collective bargaining, *see Yard–Man*, 716 F.2d at 1482 (*citing Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass*, 404 U.S. 157, 181–82, 92 S.Ct. 383, 398–99, 30 L.Ed.2d 341 (1971)), "it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services,

would be left to the contingencies of future negotiations." *Yard–Man*, 716 F.2d at 1482. Surely the parties to the collective bargaining agreement realized that employees who are willing to forego current compensation in expectation of retiree benefits "would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements." *Id.*

### III

■ Having concluded that the benefits continued beyond the expiration of the parties' last collective bargaining agreement, we now turn to consider whether, as the district court held, Porter, as Connors' parent company, is liable for financing the continuation of the benefits.[4] It is of course axiomatic that a shareholder—even if a corporation—is not responsible for the acts of the corporation. *Johnson v. Flowers Industries, Inc.*, 814 F.2d 978, 980 (4th Cir.1987). This concept of limited liability "is expressed by the colorful metaphor of the corporate veil, which presumes that acts of the corporation are not acts of the shareholder." *Id.* Although decisions to pierce a corporate veil, exposing those behind the corporation to liability, must be taken reluctantly and cautiously, courts will not hesitate to take such action when justice so requires. *In re County Green Ltd. Partnership*, 604 F.2d 289, 292 (4th Cir.1979). Determining when "justice so requires" necessitates a careful review of the circumstances of each case—a factual inquiry particularly within the province of the district court. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684 (4th Cir.1976). Because of the discretion properly afforded district courts in making such inquiries, the district court's ultimate determination is "regarded as 'presumptively correct and [will] be left undisturbed on appeal unless it is clearly

---

4. We decline, as did the district court, to adopt Retirees' argument that the prior adjudication in Alabama concerning Porter's liability to continue the benefits for the Birmingham employees, see note 1 *supra*, bars Porter's relitigation of the issue here. As each determination to pierce a corporate veil depends on the unique facts

and circumstances of each case, one determination cannot be used to mandate another, unless the facts and circumstances are identical. They are not in this case. Therefore, the district court properly approached the question anew here.

erroneous.' " *Id. (quoting G.M. Leasing Corp. v. United States,* 514 F.2d 935, 939 (10th Cir.1975), *rev'd in part and aff'd in part,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977)).

The district court determined that, because Connors was at all relevant times acting as Porter's "agent, alter ego and mere instrumentality," it was appropriate to pierce the corporate veil and hold Porter liable for the continuation of the Retirees' benefits. We agree.

Whether the corporate veil should be pierced is necessarily a factual inquiry to be conducted on a case-by-case basis. Among other factors, we have identified the following as suggesting the propriety of piercing the veil: gross undercapitalization of the subservient corporation; failure to observe corporate formalities; nonpayment of dividends; siphoning of the corporation's funds by the dominant corporation; non-functioning of officers and directors; absence of corporate records; and the fact that the corporation is merely a facade for the operation of the dominant stockholder or stockholders. *DeWitt Truck Brokers,* 540 F.2d at 685–87.

■ The district court properly identified and concentrated upon several of the relevant factors. It first found that it would be "fundamentally unfair" to allow Porter to escape liability by hiding behind Connors' corporate existence. This unfairness, the court noted, was rooted, in part, in Porter's sale of the insolvent Connors' assets and its subsequent retention of the nearly $9 million in proceeds. The court then determined that Porter's Management and Control System, which oversaw Connors' operations, would fully justify invocation of the alter ego doctrine. The System controlled both Connors' operations, by requiring Porter's approval of all proposals, and its purse strings, by further requiring Porter's approval of any expenditures in excess of $25,000. In addition to the excessive control exercised by Porter over Connors through its System, which might indeed have sufficed to penetrate Connors' fictional veil, *see Flowers Industries,* 814 F.2d at 981 (holding that corporate sepa-

rateness will be disregarded when the parent dominates the subsidiary "to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation"), the district court identified additional factors pointing in this direction. For example, the court found that (1) Connors was grossly undercapitalized at $5 million, given its purported corporate undertakings; (2) Porter, again through its Management and Control System, usurped the functions ordinarily served by the junior corporation's officers and directors; (3) Porter continued to pay for Retirees' medical coverage and life insurance benefits after Connors closed; and (4) Porter and Connors had some common officers and directors.

After a careful review of the record, we conclude that the district court's findings are not clearly erroneous and therefore will not be disturbed on appeal. *See DeWitt Truck Brokers,* 540 F.2d at 684. Moreover, we hold that, based on the factors as identified by the district court, including the significant element of unfairness that would result were we to allow Porter to be protected by Connors' corporate form, "[t]his case patently presents a blending of the very factors which courts have regarded as justifying a disregard of the corporate entity in furtherance of basic and fundamental fairness." *Id.* at 689.

### IV

Based on the foregoing reasons, we affirm. Because we have concluded that the benefits at issue here survived the expiration of the collective bargaining agreement, and that Porter must finance the benefits' continuation, it is not necessary to discuss the district court's alternative reasons for finding for Retirees.

AFFIRMED.