**UNITED STEELWORKERS OF AMER-ICA, AFL–CIO, Douglas H. Welsh and Gilbert Picard, Plaintiffs,**

v.

**NEWMAN–CROSBY STEEL, INC., Defendant.**

**Civ. A. No. 87–0128–T.**

United States District Court, D. Rhode Island.

June 4, 1993.

Adam Robitaille, Providence, RI, Shailah Stewart, Boston, MA, for plaintiffs.

George M. Prescott, Lincoln, RI, for defendant.

## MEMORANDUM AND ORDER

TORRES, District Judge.

### BACKGROUND

This is a class action brought under the Labor Management Relations Act, 29 U.S.C. § 185, and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") on behalf of two groups of retirees of Newman–Crosby Steel, Inc. (the "Company"). One group (the "life insurance class") consists of employees who retired from the Company prior to February 12, 1986, and who were then receiving life insurance coverage paid for by the Company pur-

suant to a collective bargaining agreement between the Company and United Steelworkers of America (the "Union"), the certified collective bargaining representative for the Company's production and maintenance employees. The other group (the "pension class") consists of employees who retired from the Company on or after December 1, 1981, and who were eligible to receive supplemental pension benefits pursuant to a pension agreement between the Company and the Union. The issue presented is whether the Company was entitled to terminate those benefits upon expiration of the agreements creating them or, alternatively, whether those benefits must be provided for the lifetimes of the class members.

## FACTS

Prior to 1986, the Company operated a steel plant in the City of East Providence. Pursuant to a series of collective bargaining agreements between the Company and the Union, the Company's retirees were entitled to receive certain life insurance and pension benefits. The provision governing retiree life insurance benefits was contained in the collective bargaining agreement covering the period December 31, 1981, through December 31, 1984, which was later extended to March 31, 1986 (the "1981 CBA"). Paragraph 15.05 states that "The Company will pay the cost of providing life insurance ... on the life of each" retired employee. The amount of the benefit depended on the date on which the employee retired.

The provision governing the pension benefits at issue in this case was contained in a separate agreement executed on May 18, 1983 (the "1983 Pension Agreement") that terminated the Company's pension plan. Under the pension plan, each eligible retiree was entitled to a pension in the amount of $8 per month for each year of service, up to a maximum of 35 years. In 1981, the base amount was increased by $1 per month (the "supplemental benefit") for each employee retiring after December 1, 1981. The increase was to be effective on December 1, 1983.

The 1983 Pension Agreement terminated the pension plan with the understanding that

benefits would continue to be paid by the Pension Benefit Guarantee Corporation (the "PBGC"), which, under ERISA, is obligated to assume the responsibility for paying benefits under terminated pension plans. *See* 29 U.S.C. § 1322(a). However, the parties were aware that the PBGC would not assume responsibility for the supplemental benefit because it had been in effect for less than five years. *See* 29 U.S.C. § 1322(b). Therefore, Paragraph 3 of the 1983 Pension Agreement provided that the Company, itself, would pay supplemental benefits to all employees who retired between December 1, 1981, and December 30, 1983. Since the 1983 Pension Agreement required the Company to establish and contribute to IRA accounts for all employees who were still active as of May 30, 1983, the Company's obligation to pay supplemental pension benefits to employees retiring after that date was limited to the amount necessary to make up any difference between the monthly amount that the employee received from his IRA account and the promised supplemental pension benefit. Paragraph 6 of the 1983 Pension Agreement permitted either party to terminate the agreement after the 1981 CBA expired.

On February 12, 1986, Newman–Crosby sold all of its assets to Worthington Industries and ceased operations. In the purchase agreement, Worthington disclaimed liability for any obligations that Newman–Crosby may have owed to its employees. Instead, it negotiated a new collective bargaining agreement that made no provision for payment by Worthington of life insurance and/or pension benefits to Newman–Crosby's retirees. Neither the Union nor the retirees ever purported to release Newman–Crosby from any obligations under either the 1981 CBA or the 1983 Pension Agreement.

Immediately after the sale, Newman–Crosby gave notice that it was terminating both the 1981 CBA and the 1983 Pension Agreement, and it stopped providing life insurance benefits and supplemental pension benefits to its retirees. That action precipitated this suit to recover what the affected retirees contend is the value of those benefits.

The complaint contains five counts. Count One seeks damages under ERISA claiming

that the Company's actions constituted a violation of the Company's life insurance plan. Count Two seeks damages for failure to provide life insurance benefits on the theory that the Company breached the 1981 CBA. Count Three seeks damages under ERISA for failure to pay the supplemental pension benefits. Count Four seeks damages for failure to pay supplemental pension benefits on the theory that such failure constitutes a breach of the 1983 Pension Agreement. Count Five alleges that the Company failed to comply with ERISA's procedural requirements when it terminated the 1983 Pension Agreement.

## DISCUSSION

### I. *Life Insurance Benefits*

#### A. *The 1981 Collective Bargaining Agreement*

The issue with respect to the retirees' claim that they are entitled to life insurance benefits under the 1981 CBA is whether Paragraph 15.05 of that agreement requires the Company to provide such benefits for the duration of an employee's retirement or only until the expiration of the 1981 CBA.

■ Generally speaking, collective bargaining agreements are construed in accordance with substantive federal law. *Keffer v. H.K. Porter Co.,* 872 F.2d 60, 62 (4th Cir. 1989); *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of America (UAW) v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). However, traditional rules of contractual interpretation are applied as long as they are consistent with federal labor policies. *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1293 (6th Cir.1991); *Keffer,* 872 F.2d at 62; *Yard–Man,* 716 F.2d at 1479. Thus, the Court must look first to the explicit language of the collective bargaining agreement and read the pertinent provisions in the context of the agreement as a whole. *Armistead,* 944 F.2d at 1293; *Keffer,* 872 F.2d at 62; *Yard–Man,* 716 F.2d at 1479. If the agreement is ambiguous, the Court must then look to extrinsic evidence to determine the intent of the parties. *Armistead,* 944 F.2d at 1293; *Yard–Man,* 716 F.2d at 1480.

As already noted, Paragraph 15.05 of the 1981 CBA states that the Company "will pay the cost of providing life insurance ... on the life of each" retired employee. However, neither Paragraph 15.05 nor any other provision in the 1981 CBA expressly addresses the period of time for which those benefits must be provided.

■ The Company argues that the parties intended to require that life insurance benefits be provided to retirees only for the duration of the 1981 CBA and not for the retirees' lifetimes. As evidence of that intent, it cites two documents describing the group life insurance benefits provided pursuant to Paragraph 15.05. The first document is a booklet prepared by the insurance company from which one of the policies was purchased. It states: "Your Life insurance terminates when you are no longer eligible [e.g., when employment terminates] or when the group policy terminates, whichever happens first." The Company also points to a similar provision in the Summary Plan Description (the "SPD") that it issued to employees pursuant to the requirements of ERISA. That provision states: "On any premium due date the Plan Sponsor [Newman–Crosby] may terminate the group insurance, or ... modify, amend or change the provisions, terms, and conditions of the policy."

The Court does not find those documents persuasive indicia of the parties' intent for several reasons. First, the brochures merely describe the coverage purchased by the Company to fulfill its obligation under Paragraph 15.05. They cannot and do not modify that obligation. The mere fact that the policy the Company chose to purchase may be terminable does not make the Company's duty to provide life insurance benefits terminable. By the same token, the SPD's description of the benefits provided by the Company cannot modify the provisions of the 1981 CBA.

In addition, the brochures relied upon by the Company do not refer to the group policies that were in effect when the members of the life insurance class retired. They describe policies applicable to other time peri-

ods. The Company failed to present any evidence regarding the contents of the brochures applicable to policies in effect at the time members of the life insurance class retired.

Finally, the SPD's language relied upon by the Company does not satisfy the requirements of ERISA. ERISA mandates that SPD's specify "in a manner calculated to be understood by the average plan participant ... [the] circumstances which may result in disqualification, ineligibility or denial or loss of benefits." 29 U.S.C. § 1022. Here, the SPD merely alerts employees that the Company could terminate any group insurance policy that it might have purchased as one method of fulfilling its obligation under Paragraph 15.05. It does not advise employees that the life insurance benefits themselves could be terminated. The Company's failure to state that life insurance benefits for retirees could be terminated unilaterally by the Company even though ERISA required a clear statement of terminability is an indication that the Company, itself, did not view the benefits as terminable.

■ Further indications may be found in the statements and conduct of various agents of the Company. Mr. Martin, Newman–Crosby's former president, testified that the termination provision in the life insurance brochure did not apply to retirees. He acknowledged that retirees continued to be eligible for life insurance benefits after leaving the Company's employ and, also, on those occasions when particular group policies were terminated and replaced by other group policies. Furthermore, during collective bargaining negotiations, the Company's attorney resisted any discussion of retiree benefits, noting that such benefits were costly and that retirees were taken care of "for the rest of their lives." Similar statements were made to employees when they retired. Thus, Mr. Conforti, the Company's Personnel Director and Vice President of Industrial Relations, told Mr. Picard that he did not have to worry any more about life insurance, and both Mr. Picard and Mr. Welsh testified that employees were not told that their life insurance benefits could be terminated after they retired.

■ A final indication of what the parties intended may be found in the very nature of retiree benefits. Retiree benefits are generally considered to be "status" benefits that are expected to continue as long as the employee is retired. *See Smith v. ABS Industries, Inc.,* 890 F.2d 841, 846 (6th Cir.1989) (citing *Yard–Man,* 716 F.2d at 1482) (citation omitted); *Keffer,* 872 F.2d at 64. They are sometimes described as a form of delayed compensation or reward for past services. *See Yard–Man,* 716 F.2d at 1482. Because retirees cease to be members of the bargaining unit, the company is not required to bargain with respect to their benefits, and the union is not obligated to represent their interests. *Id.* Therefore, it is unlikely that the parties would leave retiree benefits to the vagaries of future negotiations. *Id. See also Armistead,* 944 F.2d at 1294 (quoting *Yard–Man,* 716 F.2d at 1482). Consequently, it is reasonable to infer that unless otherwise specified, retiree benefits are intended to continue for the duration of an employee's retirement. *See Yard–Man,* 716 F.2d at 1482.

### B. *ERISA*

■ In Count One, the life insurance class alleges that the Company's termination of life insurance benefits for retirees constitutes an ERISA violation. ERISA permits a participant in a plan covered by ERISA to bring a civil action to recover benefits due under the plan. 29 U.S.C. § 1132(a). The term "plan" includes any employee welfare benefit plan which the statute defines as any plan or program established or maintained by an employer for the purpose of providing, among other things, death benefits. 29 U.S.C. § 1002(1).

In this case, Paragraph 15.05 of the 1981 CBA establishes a welfare benefit plan under ERISA. Since Newman–Crosby violated Paragraph 15.05 by terminating life insurance benefits for retirees, the retirees are entitled to relief under ERISA. *See Armistead,* 944 F.2d at 1298; *Delgrosso v. Spang and Co.,* 769 F.2d 928, 934–936 (3rd Cir. 1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986).

■ Even if Paragraph 15.05 permitted the Company to terminate life insurance benefits for retirees, the Company's failure to adequately apprise retirees of the circumstances under which those benefits could be terminated was a violation of ERISA. *See* 29 U.S.C. § 1022. As already noted, the SPD prepared by the Company did not satisfy the requirements of ERISA because it did not clearly set forth the circumstances that might result in a denial or loss of life insurance benefits. Furthermore, Mr. Martin was unable to say that SPD's were even sent to retirees. There was evidence that SPD's were distributed to active employees along with their paychecks, but there was no indication that SPD's were sent to employees after they retired. The Company's failure to comply with ERISA's requirements regarding terminability of life insurance benefits precludes it from terminating those benefits.

## II.  *Supplemental Pension Benefits*

### A.  *The 1983 Pension Agreement*

■ The resolution of the pension class's claim that its members are entitled to supplemental pensions benefits hinges on the interpretation of the 1983 Pension Agreement. Specifically, the issue is whether that agreement requires the Company to pay supplemental pensions for retirees' lifetimes.

As already noted, the 1983 Pension Agreement provided for termination of Newman–Crosby's preexisting pension plan in the expectation that the obligation to pay basic pension benefits would be assumed by the PBGC. Therefore, the agreement makes the Company responsible only for the supplemental benefits not guaranteed by PBGC to the extent that such benefits exceeded the amount generated by each employee's IRA account.

The Company contends that, under Paragraph 6 of the 1983 Pension Agreement, it was entitled to terminate both the agreement and the payment of supplemental pension benefits. Paragraph 6 states:

6.  *Term of Agreement:* This Agreement shall continue in effect until either party shall give written notice of the termination to the other, but in any event shall not terminate prior to December 1, 1984, *provided, however,* no subsequent amendment or renegotiation of this Agreement shall deprive any former employee of any benefit provided to said employee under [this agreement].

1983 Pension Agreement, Paragraph 6 (emphasis added).

The Company concedes that the "provided, however" clause prevents pension benefits from being eliminated by subsequent amendment to or renegotiation of the collective bargaining agreement but argues that it does not preclude elimination of those benefits through termination of the agreement. Such a hypertechnical reading of that language distorts its plain meaning and subverts the manifest purpose of the agreement.

The obvious function of the proviso clause was to ensure that retirees' pension benefits could not be eliminated by future changes in the collective bargaining agreement. The Company's argument that the parties intended to prohibit a subsequent *mutual* agreement between the Company and the Union that would deprive retirees of their pension benefits, but intended to allow the Company to later *unilaterally* terminate those benefits is nonsensical.

Moreover, the fact that the supplemental benefits for which Newman–Crosby assumed responsibility were supplementary to lifetime benefits guaranteed by the PBGC is a clear indication that the parties intended the supplemental benefits to be lifetime benefits as well. That conclusion is reinforced by the very nature of pension benefits. Pension benefits are almost by definition lifetime benefits. They are designed to provide income to a retiree for the rest of his life. They are the epitome of status benefits designed to continue for as long as the employee is retired. *See, e.g., Yard–Man,* 716 F.2d at 1482; *Hoefel v. Atlas Tack Corp.,* 581 F.2d 1, 5 (1st Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). In short, a benefit that may be unilaterally terminated by an employer at any time hardly can be characterized as a pension benefit.

For all of the foregoing reasons, the Court finds that the parties intended that the sup-

plemental pension benefits provided for in the 1983 Pension Agreement would be payable for the lifetime of each retiree.

## B. *ERISA*

■ In Count Three, the pension class alleges that the Company's termination of supplemental pension benefits also constitutes an ERISA violation. ERISA permits a participant in or beneficiary of a pension plan to bring a civil action to recover benefits due under the plan. 29 U.S.C. § 1132. The term "pension plan" includes any plan, fund or program established or maintained by an employer that provides retirement income to employees. 29 U.S.C. § 1002(2).

The Company argues that the 1983 Pension Agreement did not establish a pension plan because it falls within an exception contained in the regulations promulgated under ERISA by the Secretary of Labor. Specifically, it cites 29 C.F.R. 2510.3–2(g) which provides that cost-of-living adjustments ("COLA's") to pension benefits are welfare benefits rather than pension benefits. Therefore, the Company contends that ERISA's provisions regarding vesting and nonforfeitability of pension benefits do not apply. *See* 29 U.S.C. § 1053.

The Court rejects that argument. The evidence of discussions occurring during the collective bargaining negotiations indicates that the parties themselves did not view the supplemental benefits as COLA payments. Furthermore, the supplemental benefits are in the form of fixed payments based on length of service and bear no relationship to changes in the cost of living. Therefore, it is clear that they fall within the broad definition of pension benefits contained in 29 U.S.C. § 1002(2) and not the narrow exception set forth in 29 C.F.R. 2510.3–2(g).

In sum, the 1983 Pension Agreement requires the Company to pay supplemental benefits to members of the pension class for their lifetimes. In addition, because those benefits are pension benefits, they became vested and nonforfeitable under ERISA. *See* 29 U.S.C. § 1053. Consequently, the Company's termination of those benefits was a violation of ERISA. *See e.g., Armistead,*

944 F.2d at 1298; *Delgrosso,* 769 F.2d at 934–36 (3rd Cir.1985).

## III. *Count Five*

In Count Five of the complaint, the pension class alleges that the Company's termination of the 1983 Pension Agreement without complying with the procedural requirements of 29 U.S.C. § 1341 constituted an independent violation of ERISA. The applicable sections of 29 U.S.C. § 1341 were enacted in 1986, after the Company had terminated the pension plan, but Congress purported to make them retroactive to January 1, 1986. *See* Act of April 7, 1986, Pub.L. 99–272, § 11019, 100 Stat. 280. The Company raises a serious question regarding the constitutionality of applying those provisions retroactively. However, the Court need not address that question because, in light of the Court's holding with respect to Counts Three and Four, the claim asserted under Count Five is moot.

## IV. *Damages*

■ Generally speaking, the measure of damages for failure to pay welfare or pension benefits under either a breach of contract or violation of ERISA theory is the amount necessary to compensate the Plaintiffs for the lost payments; or, to put it another way, the amount necessary to put the Plaintiffs in the same position they would have occupied if the benefits had been paid. *See* 29 U.S.C. § 1132; *Armistead,* 944 F.2d at 1290 (employer liable for the continuation of benefits promised under the benefit plan); *Keffer,* 872 F.2d at 65 (same).

Under Paragraph 15.05 of the 1981 CBA, the Company was obligated to pay the cost of providing insurance in the amount of $3,750.00 on the life of each employee retiring after August 1, 1970. Since it did not do so, the measure of damages to a retiree presently living is the cost of purchasing such insurance now, or, alternatively, the present value of that amount payable upon the retiree's death. Claude Poulin, the Plaintiffs' actuary, testified that those two figures are virtually identical. He used the latter approach and based his calculations on mortality tables and interest rate assump-

tions used by insurance companies.[1] Mark Magnus, the Company's actuary, conceded that Mr. Poulin's method of calculating damages was reasonable.

The Court finds that Mr. Poulin's figure of $196,569.00 is an accurate measure of the aggregate present value of the life insurance benefits in the amounts the Company was required to provide and, therefore, represents the damages sustained by those members of the life insurance class who are presently living.

A different method must be used to calculate damages in the cases of deceased retirees. Obviously, retirees who have died cannot now purchase insurance to replace the insurance that the Company was obligated to provide. Therefore, the measure of damages in each of those cases would be the face amount of the insurance that should have been provided plus interest from the date of the retiree's death to the present. Once again, the Court accepts as accurate Mr. Poulin's calculation in the aggregate amount of $104,978.00.

The Company contends that the measure of damages with respect to both living and deceased members of the life insurance class is the amount that would have been required to purchase insurance coverage at the time benefits were wrongfully terminated in March of 1986. The Court rejects that contention for several reasons. First, such an amount bears no relationship to the actual loss suffered as a result of the Company's breach. Living retirees can no longer purchase the coverage to which they were entitled at 1986 rates. Moreover, deceased retirees have been irrevocably deprived of coverage they should have had.

The measure of damages advocated by the Company also fails to account for the retirees' entitlement to interest during the intervening years. Mr. Magnus acknowledged that, if such interest is added, the resulting amount becomes almost equal to the sum calculated by Mr. Poulin. That relatively modest difference may be attributable to the fact that Mr. Magnus was asked to make his interest calculations on the witness stand, without preparation, and to the fact that Mr. Magnus used a different discount factor than that used by Mr. Poulin.

### B. *The Pension Class*

Members of the pension class are entitled to recover the supplemental pension benefits that should have been paid to them since March, 1986, plus interest. In addition, those members who are still living are entitled to the present value of future stream of earnings represented by those supplemental benefits for the rest of the members' lifetimes. In the case of employees who retired after May, 1983, the amounts received from IRA accounts established for them by the Company must be offset in determining the supplemental benefits to which they were entitled and the balances in those accounts must be taken into account in computing the present value of future benefits. Again, the Court accepts Mr. Poulin's calculation that the aggregate amount of damages sustained by the pension class is $124,603.00.

### CONCLUSION

For all the foregoing reasons, the clerk is directed to enter judgment in favor of the life insurance class with respect to Counts One and Two in the amount of $301,547.00, plus interest from April 1, 1993, and costs. Such sum shall be distributed among the members of the class in accordance with Schedules 3A and 3B of Exhibit 22 with $196,569.00 being distributed among the retirees living on April 1, 1983, and $104,978.00 being distributed to the estates of deceased retirees.

The clerk is further directed to enter judgment in favor of the pension class with respect to Counts Three and Four in the amount of $124,603.00, plus interest from April 1, 1993, and costs. Such amount shall be distributed in accordance with Schedules 1 and 2 of Exhibit 22 with $113,357.00 being distributed among those employees who retired before March 1, 1986, and $11,246.00

---

1. It is doubtful that group insurance could be purchased because of the Plaintiffs' ages. Furthermore, if anything, Mr. Poulin's approach produces a lower figure because it does not take into account the administrative costs reflected in an insurance company's premium charges.

being distributed amount those employees who retired on or after March 1, 1986.

Count Five is dismissed without prejudice.

Upon receipt of the amounts set forth in this judgment, the Plaintiffs' counsel shall file with the Court a proposed order of distribution, and the Court reserves the right to approve or disapprove any such order after giving notice to the members of the class.

Plaintiffs' counsel may have ten days in which to file a motion requesting attorney's fees under ERISA. Any such motion should be documented and accompanied by appropriate time records and any other documentation that is required. The Defendant may have ten days following the filing of any such motion in which to file an objection to the request for attorneys' fees.

IT IS SO ORDERED.