DECISION
Before this Court is the Plaintiffs' James M. Anderson, Brian D. Burke, Gregg L. Catlow, Walter J. Mycroft, Joseph F. Pluchino, William A. Shepard and Prescott J. Williams, Warren C. Boles, Mario Ciotola, Curtis S. Pollard, Leonard Solitro, John Whitecross and Arthur Williams[1] — retired members of the Smithfield Police Department ("retirees") — motion for a declaratory judgment and injunctive relief. The retirees argue that their retirement health benefits were wrongfully altered by an interest arbitration decision because they were not parties to the underlying action and did not consent to the changes. The Defendant Town of Smithfield ("Town") maintains that the retirees' interests were represented at the arbitration and, also, that the relevant collective bargaining agreements allowed for alterations in their health benefits package. Jurisdiction is pursuant to G.L. 1956 § 9-30-1 and Super. R. Civ. P. 57.
 FACTS AND TRAVEL
The following facts are undisputed as they have been stipulated to by the parties. The plaintiff retirees are former members of the Smithfield Police Department and, therefore, former employees of the Town. All of the plaintiffs retired between July 1, 1988 and June 20, 2002. The terms and conditions of the retirees' employment and subsequent retirement have been governed by the various collective bargaining agreements executed between the Town and the police officers' union, the Smithfield Fraternal Order of Police ("FOP"). Articles XIII and XVI of the Collective Bargaining Agreement ("CBA"), in effect between 1999 and 2002 (the "1999 CBA"), contained the same language regarding healthcare benefits for retirees as did the predecessor CBAs dating back at least as far as 1988.
The language of Article XIII of the 1999 CBA discusses the health care benefits offered to active police officers and officers who take a "normal retirement."[2] The relevant portions of Article XIII, Section 1, state the following:
 "a) The Town shall pay the following health insurance coverage under the Rhode Island Blue Cross and Physicians Service Plan for active police officers of the Smithfield Police Department. . . .
 1) Blue Cross, Semi-Private, 365 days.
 2) Blue Shield Plan 100.
 . . .
 5) Chiropractic and Extended Vision Care Program coverage.
 . . .
 8) Prepaid Prescription Plan, $2.00 Co-Pay. Police officers must make a good faith effort to obtain generic drugs.
 . . .
 c) The Town agrees to allow retired members of the Smithfield Police Department, at their own expense, to remain on any benefits of subsection a) and b) that the member selects. . . .
 d) The Town shall pay, as hereinafter indicated, for continued full family or individual health care for every member of the bargaining unit who takes a normal retirement on or after July 1, 1988. The Town's obligation shall continue until (1) the retiree or his spouse receives health coverage from another employer or (2) the retiree becomes eligible for Medicare or another federally subsidized health care program. If the health care coverage offered by the new employer provides a lesser level of benefits that the Town plan, the Town shall pay to the health care provider the additional premium required to provide benefits comparable to the Town plan."
Furthermore, with respect to health care benefits for service related disabled retirees,[3] Article XVI, Section 1, provides:
 "b) . . . the Town may place the [disabled] police officer on a disability retirement and have him covered by the disability provisions of the retirement program existing between the Town and the Union at that time.
 c) Any employee who has been place on disability retirement as a result of injury in the performance of his duties for the Town shall continue to receive all medical and dental benefits afforded by this agreement, for all such retirements on or after July, 1981. . . ."
When the 1999 CBA expired, the Town and the FOP attempted to come to an agreement on terms for a new contract. Eventually, after a period of bargaining, it was determined that the parties would be unable to resolve some of their differences, including the terms of the health coverage to be provided. As a result, they submitted the unsettled issues to interest arbitration pursuant to the Policeman's Arbitration Act, G.L. 1956 § 28-9.2-1
et. seq.
The Town proposed that the officers' primary coverage be changed from "Classic Blue Cross" to "HealthMate Coast-to-Coast." This suggestion meant that the prescription co-payments would change from $2/$5 to $5/$15/$30, depending on the prescription, and that the number of annual chiropractic visits provided would be reduced from twelve to six. The interest arbitration panel (the "panel") adopted the Town's proposals in its written decision rendered on June 25, 2005. The panel found, "[t]he Town's replacement of the Classic plan with the Healthmate plan is acceptable" as the "Union made no argument that the extent of the Healthmate plan's coverage was in any way inferior to the Classic plan's, except for the limitation on chiropractic care." (Decision at 31.) It noted that the prescription co-payment of $2/$5 was "exceptionally low in these times." Id. Furthermore, the panel stated that it did not find the limitation on chiropractic care to be significant because "there was no showing that the bargaining unit members were particularly dependant on the . . . benefit." Id.
Following the panel's decision, on July 7, 2005, Dennis Finlay, the Town's Treasurer, sent a memorandum to the "Smithfield Retired Police Officers" advising them that pursuant to the panel's award their healthcare coverage would be changing from Blue Cross Classic to HealthMate Coast-to-Coast on approximately September 1, 2005. The very next day, July 8, 2005, Mr. Finlay sent a notice to "Smithfield Active and Retired Police Officers" informing them that August 1, 2005, would be the day the healthcare change would be effectuated.
On July 27, 2005, the retirees filed a complaint with the Rhode Island Superior Court alleging anticipatory breach of contract and a violation of the Policeman's Arbitration Act, as a result of the change in their healthcare coverage. In addition, the retirees requested an injunction to prevent the Town from changing their coverage and also sought declarations from the Court that any attempted change would be a breach of contract and violation of the Policeman's Arbitration Act. The Court denied the retirees' request for injunctive relief on July 29, 2005, and, subsequently, the healthcare coverage change occurred on August 1, 2005. The Town denied the allegations in an answer filed on August 10, 2005.
Both parties have since submitted a memorandum of law, reply memoranda, and supplemental memoranda regarding whether or not this Court should declare that the changes to the healthcare plan, instituted by the panel, apply to the retirees. Oral arguments on the matter were heard before this Court on October 17, 2005.
 STANDARD OF REVIEW
The Uniform Declaratory Judgments Act "confers broad discretion upon the trial justice as to whether he or she should grant declaratory relief." Cruz v. Wausau Ins., 866 A.2d 1237, 1240
(R.I. 2005) (citing Employers' Fire Insurance Co. v. Beals,103 R.I. 623, 628, 240 A.2d 397, 401 (1968) ("Even if the complaint contains a set of facts which bring it within the scope of our declaratory judgments act, there is no duty imposed thereby on the court to grant such relief, but rather the court is free to decide in the exercise of its discretion whether or not to award the relief asked for.")). "The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree." Section 93-0-1.
 HEALH CARE COVERAGE
The retirees argue that the change in healthcare coverage, approved by the interest arbitration panel, is not applicable to them. The retirees maintain that they were not contemplated by either party, the FOP or the Town, during the negotiations for the new CBA and, therefore, their rights cannot be affected by the panel's decision. They claim that their interests were not represented at any point during the negotiation process. The retirees note that there were never any proposals to modify Article XIII, § 1(d), dealing with retirees' benefits, nor were there any proposals to address any part of Article XVI. Moreover, the retirees underscore the fact that the panel does not mention "retirees" anywhere in its decision. Finally, they argue that once an employee retires, his or her benefits are "set in stone" at the moment of retirement and cannot be altered regardless of availability or cost.
On the other hand, the Town maintains that the predecessor CBAs, under which the retirees claim their benefits are derived, merely afford the retirees the opportunity to participate with the active officers in the Town plan and do not guarantee the specific healthcare benefits in existence at the time of retirement. The Town argues that such an interpretation is mandated by the clear language of the CBA. Furthermore, the Town asserts that, considering the exponential rise in healthcare costs, the equities of the situation also require a determination that it can alter the retirees' healthcare coverage.
The evidence in this case regarding whether or not retirees were represented during the negotiations is sparse. The interest arbitration decision fails to mention retirees in any manner, and the parties themselves have not provided anything indicating that retirees were contemplated at any point of the process. Although the retirees argue that the changes instituted cannot apply to them because they were not represented during the negotiations, this claim initially depends on whether the language of the CBA allows the Town unilaterally to modify the retirees' benefits as changes are made to the active officers' plan. Therefore, at the outset, it must be determined whether or not the CBA provided the retirees with a vested, unalterable right to the healthcare coverage upon their respective retirements or, conversely, simply a right to participate in the Town's plan for the active officers.
A. Contract Interpretation
When seeking to interpret the terms of a collective bargaining agreement, courts look to the general principles of contract law.See Webster v. Perotta, 774 A.2d 68, 87-88 (R.I. 2001);Providence Teachers Union v. Providence Sch. Bd., 689 A.2d 388,392-93 (R.I. 1997). It is well-settled that the primary task in interpreting a contract is to "attempt to ascertain the intent of the parties." Woonsocket Teachers' Guild v. Sch. Comm. of theCity of Woonsocket, 117 R.I. 373, 376, 367 A.2d 203, 205 (1976). The intention of the parties must govern if that intention can be clearly inferred from the terms and express language of the contract. Id. (citations omitted). Furthermore, a "contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." Garden City Treatment Ctr., Inc.v. Coordinated Health Partners, Inc., 852 A.2d 535, 541-542
(R.I. 2004) (citations omitted). In Rhode Island, "[w]e also adhere to the rule of interpretation that when considering `whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning.'" Id. at 542 (citing Rubery v.Downing Corp., 760 A.2d 945, 947 (R.I. 2000) (quoting Rotelliv. Catanzaro, 686 A.2d 91, 94 (R.I. 1996))).
1. Right to Specific Health Care Benefits
Viewing the terms and express language of the 1999 CBA and its predecessors, the Court finds that the parties did not intend to forever bind the Town to provide the retirees with the specific benefits listed in Article XIII, Section 1(a). The health care coverage provided to retirees taking a normal retirement is granted under Article XIII, Section 1(d), which states: "[t]he Town shall pay, as hereinafter indicated, for continued full family or individual health care for every member of the bargaining unit who takes a normal retirement on or after July 1, 1988." This language in no way suggests that the Town must provide the retirees with the specific Blue Cross plan offered to the active police officers under Article XIII § 1(a). The clause does not reference any specific benefits — the number of chiropractic visits, the $2/$5 co-pay or the type of plan in general — nor does it reference Article XIII, Section 1(a) or the benefits contained therein. The only intent that can be gleaned from the language of Article XIII, Section 1(d) is that of the Town to provide some form of health care to officers who take a normal retirement.
Similarly, the language of Article XVI, Section 1(c), regarding disability retirement health care benefits, cannot be interpreted to provide a vested right to the specific benefits enumerated in Article XIII, Section 1(a). Article XVI, Section 1(c) states that officers taking disability retirement "shall continue to receive all medical and dental benefits afforded by this agreement." Although the words "afforded by this agreement" may suggest that these officers are entitled to receive the exact health care benefits described in the particular agreement, such an interpretation is not supported when viewing the agreement in its entirety.
It would be inconsistent and illogical if the agreement provided disabled retirees with vested, specific, health care benefits while excluding officers who take a normal retirement from receiving the same. In addition, Article XVI, Section 1(c), like Article XIII, Section 1(d), neither explicitly refers to any particular medical benefits nor references Article XIII, Section 1(a) or the benefits detailed therein. Ultimately, the only reasonable conclusion that can be reached is that disabled retirees, through Article XVI, Section 1(c), are entitled to receive the same health care coverage afforded to active officers, whatever that may be. Considering the clauses regarding the health care benefits for retirees in the context of the agreement as a whole, this Court finds no ambiguity, as nothing indicates the Town's intention to be bound by the specific terms of Article XIII § 1(a). See Utility Workers, Local 369, RobertJ. Dupre v. NSTAR Electric and Gas Corp., 317 F. Supp. 2d 69, 76
(D. Mass. 2004) (the contract plainly stated that the retirees "will be covered" and the court found that "the plaintiffs have failed to identify any provision of the [health care plan] that provides vested lifetime health insurance coverage"); seealso Sprague v. Gen. Motors Corp., 133 F.3d 388, 400 (6th Cir. 1998), cert. denied, 524 U.S. 923 (1998) ("the intent to vest must be found in the plan documents and must be stated in clear and express language"); American Fed'n of Grain Millers v.Int'l Multifoods Corp., 116 F.3d 976, 982 (2nd Cir. 1997) (retirees not entitled to vested medical benefits because the unambiguous language of the CBAs indicated otherwise); In reUnisys Corp. Retiree Medical Benefit "ERISA" Litig.,58 F.3d 896, 903-04 (3d Cir. 1995) ("the fact that the . . . plans used terms such as `lifetime' or `for life' to describe the duration of retiree medical benefits, while at the same time expressly reserving the company's right to terminate the plans under which those benefits were provided, did not render the plans `internally inconsistent' and therefore ambiguous"); Roth v.City of Glendale, 614 N.W.2d 467, 475 (Wisc. 2000) (Sykes, J., concurring) ("the court should look first to the four corners of the contract itself for evidence to rebut the initial presumption that the obligation expires when the contract does"). Therefore, under the terms of the relevant CBAs, the retirees are not entitled to receive, for so long as they are eligible for coverage, the substantive health care benefits specifically enumerated in Article XIII, Section 1(a).
2. Policy Considerations and Vesting Presumptions
In addition to a lack of language in the contract supporting a finding that the retirees are entitled to the specific welfare benefits[4] that were provided at the time of their retirements, there are significant policy considerations that encourage that outcome. Initially, it should be noted that Rhode Island courts have consistently looked to federal law for guidance in the field of labor law. DiGuilio v. Rhode Island Bd.of Corr. Officers, 819 A.2d 1271, 1273 (R.I. 2003) (citingMacQuattie v. Malafronte, 779 A.2d 633, 636 n. 3 (R.I. 2001) (per curiam); Bd. of Trustees, Robert H. Champlin Mem'l Libraryv. Rhode Island State Labor Relations Bd., 694 A.2d 1185, 1189
(R.I. 1997)). A number of federal courts have articulated a presumption for or against vested benefits.
The First Circuit, in addition to other circuit courts, has favored a presumption against vested benefits. It is the policy of the First Circuit, with regard to employer obligations, that although an employer can contractually bind itself to maintain benefits at a certain level, "such an obligation `is not to be inferred lightly.'" Utility Workers, Local 369,317 F. Supp. 2d at 76 (quoting Int'l Union, United Aerospace Agric. ImplementWorkers of Am., U.A.W. v. Skinner Engine Co., 188 F.3d 130, 139 (3d Cir. 1999) and citing Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992)). The Ninth Circuit has succinctly stated that "[r]etiree medical benefits do not become vested once an employee becomes eligible or retires." Williams v. Caterpillar,Inc., 944 F.2d 658, 666-67 (9th Cir. 1991). Additionally, "several circuits require that employers agree to vested benefits in writing as part of the plan documents." Utility Workers,Local 369, 317 F. Supp. 2d at 76 (citing Sprague,133 F.3d at 400). The Second Circuit explained its reasoning for adopting a rule requiring that vested benefits appear in writing as follows:
 "With regard to an employer's right to change medical plans, Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans. Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation. These unstable variables prevent accurate predictions of future needs and costs." Int'l Multifoods Corp., 116 F.3d at 979 (quoting Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988)).
The Second Circuit later applied this rule in Joyce v.Curtiss-Wright Corp., 171 F.3d 130, 135 (2d Cir. 1999), stating that it "will not infer a binding obligation to vest benefits absent some language that itself reasonably supports that interpretation."
In contrast, some courts have chosen to apply a presumption in favor of vested benefits. The court in United Steel Workers ofAm. v. Newman-Crosby Steel, Inc., 822 F. Supp. 862 (D.R.I. 1993), reasoned that because retirees are not members of the bargaining unit and companies are not required to bargain with them, it would be unlikely that the parties would "leave retiree benefits to the vagaries of future negotiations." Id. at 866. As a result, the court decided to draw an inference that retiree benefits are intended to continue for the duration of an employee's retirement. Id. (citing Int'l Union, United Auto.,Aerospace, and Agric. Implement Workers of Am. (UAW) v.Yard-Man, Inc., 716 F.2d 1476, 1482 (6th Cir. 1983)). Similarly, the Supreme Court of Wisconsin has adopted a rule in favor of vesting retirees' benefits in order to safeguard the retirees from potential economic devastation. Roth, 614 N.W.2d at 473. Other courts have taken the view that retirement benefits are a form of deferred compensation and, therefore, it is unlikely that employees would forego higher wages without the assurance that the bargained-for benefits would be forthcoming upon retirement.See United Paper Workers Int'l Union, Local 1020 v. MuskegonPaper Box Co., 704 F. Supp. 774, 776-77 (W.D. Mich. 1988);Yard-Man, Inc., 716 F.2d at 1482.
Assuming arguendo that the intent of the parties in the case at hand was not discernible from the language of the relevant CBAs, this Court would apply a presumption against vesting specific benefits. The Court is persuaded that it is sound policy not to bind an employer to a lifetime obligation absent specific language indicating such an intent. Although the Court recognizes the financial consequences that such a rule could have on retirees, an adoption of the alternative policy could similarly place an employer in a perilous situation.[5] If the financial strain of providing lifetime benefits were significant enough, an employer could end up in a situation where it would no longer be able to conduct business and, as a result, no longer be able to provide benefits to retirees. Furthermore, it should be noted, contract negotiations involving employees' retirement benefits are not performed in a vacuum. As the Supreme Court of Connecticut stated:
 "it runs counter to all of the parties' interests to construe the agreements in the present case as conferring on the plaintiffs the exact plan set forth under the agreement in effect at the time of the retirees' retirement. The continued availability of the pertinent plan is dependent upon a third party not bound beyond the term of the agreement — the insurer. . . . The insurer could decide to discontinue coverage of city employees or discontinue the particular plan. It could also raise the cost of coverage to the point that it no longer would be feasible for the city to procure insurance. The defense of impossibility of performing the contract, therefore, would release the city from its obligation and leave the retirees with no medical insurance."
Poole v. City of Waterbury, 831 A.2d 211, 233 (Conn. 2003);see also Utility Workers, Local 369, 317 F. Supp. 2d at 74
(court determined that "the phrase `will be covered' cannot mean a lifetime of unaltered coverage, as the plaintiffs contend, because the health benefit plans contain language in which the insurance company and NSTAR reserve the right to change or cancel coverage"). It is simply unreasonable to expect an employer to provide specific health benefits for a lifetime, absent clear language, given all the uncertain variables involved in making such a promise — inflation, the third party insurance company, medical technology, the cost of treatment, etc. Given this uncertainty, the reasonable expectations of the parties, the severe nature of creating a binding lifetime obligation, and the ability of the parties to negotiate for specific language through the collective bargaining process, this Court believes that a presumption against the vesting of particular benefits is appropriate.
3. Right to General Health Care Benefits
Although the language of the relevant CBAs do not provide the retirees with a guarantee of specific benefits, the terms of the CBAs do indicate the parties' intent to provide the retirees with continued health care coverage. Generally, in the ordinary course, contractual obligations will not survive beyond the expiration of a collective bargaining agreement. Litton Fin.Printing Div. v. Nat'l Labor Relations Bd., 501 U.S. 190, 207
(1991). "Exceptions are determined by contract interpretation" and "rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement." Id.
Here, both Article XIII, Section 1(d) and Article XVI, Section 1(c) state that the retirees — normal and disabled — are to receive "continued" health care benefits. The only limitations on the receipt of continued health benefits, as stated in Article XIII § 1(d), arise when a retiree receives coverage from another source or is eligible for Medicare. Furthermore, the Town's willingness to supply health care coverage to the retirees following the expiration of the CBA and the arbitration award is another indication that the retirees are entitled to continued coverage. Viewing the contract as a whole, the word "continue" clearly evidences the parties' intent that the retirees' health insurance coverage would survive the expiration of the 1999 CBA.
B. The Arbitration Decision
Preliminarily, the retirees argue that, under the Supreme Court's decision in Allied Chemical Alkali Workers of Am.,Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157
(1971), even if the terms of the CBAs only entitle them to participate in the active police officers' benefits plan, the changes to the coverage approved by the interest arbitration panel cannot apply to them as they were never represented during any part of the negotiation process. In Allied Chemical, where retirees' right to pension benefits was at issue, the Court stated that "[u]nder established contract principles, vested retirements rights may not be altered without the pensioner's [or retirees'] consent." Id. at 182 n. 20. In the instant matter, as stated above, the only vested right the retirees enjoy is the right to continued receipt of health care coverage from the Town and not the substantive health care benefits. That right to continued health care has neither been altered by the negotiations between the Town and the Union, nor has it been affected by the interest arbitration panel's decision. As a result, although it is not clear whether the retirees' interests were ever represented during the negotiations and before the arbitration panel, their participation was not necessary since their vested right to health care coverage remains intact.
Having determined that the terms of the 1999 CBA do not give the Town free reign to completely eradicate the retirees' health care benefits, but that the retirees are not entitled to the specific benefits they were receiving at the time of their retirements, the question remains as to what benefits are ultimately mandated by the contract. Until the expiration of the 1999 CBA and, ultimately, the arbitration decision, the retirees were receiving the exact benefits provided to the active police officers as set forth in Article XIII, Section 1(a). Moreover, the specific benefits of the health care provided by the Town were only listed under the section of the CBA pertaining to active police officers' coverage. It logically follows that the retired officers' health benefits are linked with those provided for the active officers and that it was the parties' intent, when drafting the CBA, to allow the retirees to participate in whatever health care plan was offered to the active employees.
The retirees raise the hypothetical question as to what would happen to their health care coverage if, through negotiations, the active police officers decided to completely forego any right to receive health care benefits in return for a cash stipend or pay increase. Based upon this Court's analysis, such an agreement would violate the retirees' right to receive continued health care benefits but, ultimately, that issue is not before this Court and the resolution should be left for the court presented with those precise facts. Here, the changes approved by the interest arbitration panel were not substantial enough to amount to an effective denial of the retirees' right to continued health care benefits.[6] See Poole, 831 A.2d at 234 (under similar facts, the court found that the city could alter the benefits so long as they were substantially commensurate with the benefits in effect at the time of the retirees' retirement);see also Nonnenmacher v. City of Warwick, 722 A.2d 1199,1203 (R.I. 1999) (Rhode Island Supreme Court indicated that vested contractual rights might not be violated where the impairment caused by a change in benefits is "not substantial"). Finally, the retirees' assertion that the changes instituted are substantial is unavailing when, as the arbitration decision noted, the Union never even argued that the "Healthmate plan's coverage was in any way inferior to the Classic plan's [coverage]."
 CONCLUSION
The Court finds that the Collective Bargaining Agreements in effect at the time of the retirees' respective retirements did not guarantee them the specific benefits enumerated in Article XIII, Section 1(a). The language of the contracts provide the retirees with a vested right to receive continued health coverage by allowing them to participate in the plan offered by the Town to the active officers. Because the decision of the arbitration panel neither affected the retirees' vested right to receive continued health care coverage, nor substantially altered the health care benefits as a whole, the approved changes are thus applicable to the retirees. The parties are hereby instructed to submit an appropriate judgment for entry.
[1]Warren C. Boles, Mario Ciotola, Curtis S. Pollard, Leonard Solitro, John Whitecross and Arthur Williams were added as Plaintiffs by Stipulation dated September 27, 2005.
[2] Article XIII, Section 1(d), defines "normal retirement" as either "[r]etirement after a minimum of twenty (20) years of service and/or purchased military time" or "[r]etirement after a minimum of ten years of service at a minimum if fifty-five (55) years of age."
[3] Article XVI, Section 1(a), states that "[a]ll police officers of the Smithfield Police Department injured while in the performance of duty shall receive full salary from the date of incapacity until placed on disability retirement by the Town." In addition, Article XVI, section 1(b), provides that "a police officer who has been injured in the performance of his duty is unable, after six (6) months, to perform his regular assignment (which period may extend to twelve (12) months in the discretion of the Town Manager upon submission of satisfactory medical documentation), the Town may place the police officer on a disability retirement."
[4] Welfare benefits of retirees are generally defined to include health, dental, and life insurance benefits. See Int'lMultifoods Corp., 116 F.3d at 979 ("[b]ecause [the employer's] plan provides medical benefits, it is a welfare plan").
[5] For a recent discussion of the looming fiscal crisis related to pension and retiree health care costs, see the following articles: Zachary R. Mider, Serious drought in town'spolice pension fund, The Providence Journal, West Bay Edition, October 14, 2005, at D1 and Katherine Gregg, It's a fiscalnightmare: Health benefits for retirees, The ProvidenceJournal, December 18, 2005, at A1.
[6] The Court's conclusion follows the arbitration panel's finding that the existing $2/$5 prescription co-pays were "exceptionally low in these times" and, reducing chiropractic coverage from twelve to six visits annually was not a significant change as there was no showing that bargaining unit members were dependent on this benefit.