DECISION
Before the Court are cross-motions for summary judgment pursuant to Super. R. Civ. P. 56 filed by the Defendant Town of Johnston (hereinafter "Johnston" or "Town") and Plaintiffs Robert Faella, John DiMaio, and Allen Ross (hereinafter "Faella," "DiMaio," and "Ross" respectively, and "Plaintiffs" collectively). Plaintiffs are former Johnston police officers who retired due to injuries sustained in the line of duty.[1] Plaintiffs were members of the International Brotherhood of Police Officers (hereinafter "IBOP") and currently are receiving disability pension benefits pursuant to either the 2001-2004 or 2005-2008 collective bargaining agreements (hereinafter "CBAs") between *Page 2 
the Town and the IBOP, which were in place when Plaintiffs retired.[2] At issue is whether Plaintiffs are entitled to distributions from certain accounts (hereinafter "ING Accounts") into which they have contributed while employed by Johnston or whether these accounts are merely a funding mechanism for defined pension benefit plans provided for under applicable CBAs.
 I Facts and Travel
Because the relationship, or lack thereof, between the ING Accounts mentioned above and the CBAs is at the heart of this dispute, the Court will first discuss the facts underlying the ING Accounts and then the facts with regard to the CBAs.
 A The ING Accounts
On or about April 26, 1984, Johnston, by and through its then mayor, Ralph aRusso (hereinafter "Mayor aRusso"), established a so-called 457 deferred compensation plan, [3] comprised of the ING Accounts, for officers of the Johnston Police Department who elected to participate (hereinafter "participants") with Aetna Life Insurance and Annuity Company (hereinafter "ING").[4] Under the plan, two ING accounts were established on behalf of each participant: 1) a "fixed account" into which the Town *Page 3 
would contribute a percentage of each participant's annual compensation (hereinafter "Johnston's ING Account"); and 2) a participant account into which the participant deferred a portion of his or her salary to be withdrawn upon retirement (hereinafter "participant ING Accounts"). Each participant could elect to establish his or her participant ING Account as either (a) a fixed account or (b) a guaranteed accumulation account.[5] Both a participant's Johnston ING Account and participant ING Account were each labeled with the participant's name and social security number, and Johnston was listed as the owner and contract holder for both accounts with ING. Dep. Menard 80:17-24, 81:1-5 (March 30, 2011).[6] Per the terms of the Participation Agreement between participants and the Town, participants had the ability to 1) choose the percentage of their salary to be deferred into their sub-accounts, 2) decide whether to place their entire contributions into a fixed or guaranteed accumulation account or to divide their contributions into one of each, and 3) to subsequently change these elections in the future. Additionally, subject to the parameters agreed upon between Johnston and ING, participants invested in guaranteed accumulation accounts could decide into what types of investments their funds would be invested. *Page 4 
On or about October 25, 1993, Mayor aRusso negotiated and signed a contract with the IBOP entitled "Town of Johnston Police Department Pension Plan" (hereinafter "1993 Contract"). The 1993 Contract set specific contribution amounts for both the Town and participants into their respective ING accounts. In pertinent part, the Contract stated:
 "FORMULA FOR DETERMINING EMPLOYER CONTRIUBTION:
 (a) On behalf of each Participant for each year of his participation in this Plan, the Employer shall contribute 12% of his annual Compensation.
 (b) As a condition of Plan Participation each Participant shall . . . contribute 6% of his Compensation . . . [and] [s]uch Contributions shall be credited to his Participant's Account and shall share in Trust earnings and losses." 1993 Contract, Art. IV § 4.1.
Along with these requirements, the 1993 Contract specified how funds in the ING Accounts were to be disbursed on the occurrence of certain triggering events including early or normal retirement, death, disability, and unilateral termination. The 1993 Contract also set constraints within which the Plan's trustee, ING, was to begin making payments to beneficiaries. See
1993 Contract, Art. VI. Language specific to retirement due to disability states:
 "DETERMINATION OF BENEFITS IN EVENT OF DISABILITY
 In the event of a Participant's Total and Permanent Disability the Trustee shall distribute to such Participant all amounts credited to such Participant's Account.
 Any disability benefits paid under this plan, as a result of Employer Contributions, shall reduce and offset any statutory disability benefits to which the Employee might otherwise be entitled." 1993 Contract, Art. VI, § 6.3. *Page 5 
Based on this provision, Plaintiffs assert that, as disabled retirees, they are entitled to distributions of the funds held their ING Accounts per the terms cited above. From the time the 1993 Contract was signed to the present day, both the Town of Johnston and plan participants have made their respective twelve (12) and six (6) percent contributions to their ING accounts in congruence with the 1993 Contract's requirements.
 B CBA Pension Provisions
During Plaintiffs' tenure with the Johnston Police Department, the Town and the IBOP have also negotiated approximately fourteen successive CBAs, [7] and over the course of these successive agreements, provisions relevant to pensions were either added or modified. The 1984-1985 CBA was the agreement in place when the 1984 ING Accounts were established. This CBA, as well as all those that followed, contained a provision calling for the creation of a pension board/committee to review and make recommendations to the Johnston Town Council (hereinafter "Town Council")[8] regarding the police pension plan. Despite this provision, however, there is no record that a committee was appointed either at that time or in 1993 when Mayor aRusso signed the 1993 Contract. The subsequent 1986-1987 CBA was the first to reference employer and employee contributions into a "Retirement Fund." This new language appeared in the *Page 6 
CBA's "Early Retirement Provisions" section and stated that officers with one to ten years of service could "withdraw from the Retirement Fund his or her six percent (6%) contribution as well as the Town's twelve (12) percent contribution into the fund . . ." 1986-1987 CBA Art. XV § 3(A)(1)-(2) (emphasis added). Since then, this language has appeared in every CBA thereafter, including the 1993-1995 CBA which was in place at the time the 1993 Contract was signed. Aside from this reference, there is no explanation or elaboration in any CBA as to how these contributions are made, where they are placed, or whether they are mandatory or voluntary.
The next relevant change to CBA language occurred in the 1995-1998 CBA, which added a provision specifically addressing disability pensions. Under that section, in addition to a standard pension calculated under the CBA pension formula, a disabled officer also received:
 "Section 4 — Disability Pension
 All police officers . . . who are injured in the line of duty and qualify for a disability pension shall receive from the Town the difference between what is his or her pension payments and sixty-six and two-thirds (66 2/3) percent of what his or her salary was at the time of the injury." 1995-1998 CBA, Art. XV, § 4.
After this addition, no meaningful changes to the pension sections of the CBAs took place until 2005 when the 2005-2008 CBA added a section entitled "Pension Contributions" that required officers to contribute six (6) percent of their gross pay. Where these contributions were to be placed, however, was not specified. Notably, no similar language requiring a set contribution on the part of Johnston was included in this new section. 2005-2008 CBA, Art. XIV, § 5. The second addition was to the 2005-2008 *Page 7 
CBA's "Pension Committee" section referenced above, where a clause was inserted that stated:
 "In the event any pension plan document, pension trust document or any other pension document conflicts with the provisions of this Agreement, the language of this Agreement controls and supersedes any language which is inconsistent or may be construed as inconsistent regarding the pension plan." 2005-2008 CBA, Art. XV, § 2.
As one of its arguments, Johnston asserts that this language applies to the 1993 Contract, such that Plaintiffs are only entitled to those benefits enunciated in the CBAs. It is unclear, however, what documents actually conflict with the CBAs because from 1983 to 2008, there are no records that the Town Council ever formally ratified the creation of the ING Accounts in 1984, the execution of the 1993 Contract, or twelve of the last fourteen CBAs between it and the IBOP.[9] Under the Johnston Town Charter (hereinafter "Charter") the Town Council is "the policy determining body." CHARTER, § (3)-(8) (1963), and because of this, Johnston asserts the Town Council is the sole authority with the power to enter into an agreement such as the 1993 Contract. Thus, a major issue before the Court is whether the 1993 Contract is valid and if so, whether it is superseded by subsequent CBAs including the duly ratified 2001-2004 and 2005-2008 CBAs.
Two separate suits were filed by Plaintiffs, which have since been consolidated.[10] Plaintiff Ross's Complaint seeks (1) declaratory judgment that he is entitled to *Page 8 
distributions from his ING Account and (2) injunctive relief compelling Johnston to make the distributions available to him. Faella and DiMaio filed jointly and seek the same relief as Ross as well as (3) attorneys' fees; and (4) damages for conversion.
Johnston has moved for summary judgment denying Plaintiffs' entitlement to separate distributions from the ING Accounts because the language of the 1993 Contract concerning these distributions was never ratified by the Town Council and because the language of the properly ratified 2001-2004 and 2005-2008 CBA's provide the only disability pension benefits to which Plaintiffs are entitled. Plaintiffs' cross-motion for summary judgment claims that Johnston is estopped from denying the validity of the 1993 Contract and that no language in any CBA, including the 2001-2004 and 2005-2008 CBAs, precludes Plaintiffs' entitlement to separate distributions from the ING Accounts.
 II Standard of Review
Summary judgment is proper when, after reviewing the admissible evidence in a light most favorable to the non-moving party, "`no genuine issue of material fact is evident from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' and the motion justice finds that the moving party is entitled to prevail as a matter of law."Smiler v. Napolitano, 911 A.2d 1035, 1038 (R.I. 2006) (quoting Super. R. Civ. P. 56(c)). In deciding a motion for summary judgment, "the court may not pass on the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Westinghouse Broad.Co., Inc. v. Dial Media, Inc.,122 R.I. 571, 579, 410 A.2d 986, 990 (R.I. 1980). *Page 9 
During a summary judgment proceeding, "the justice's only function is to determine whether there are any issues involving material facts." Steinberg v. State, 427 A.2d 338, 340 (R.I. 1981). To this end, a non-moving party opposing a motion for summary judgment "carries the burden of proving by competent evidence the existence of disputed issues of material fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions."Classic Entertainment Sports, Inc. v. Pemberton,988 A.2d 847, 849 (R.I. 2009) (internal citations omitted).
Moreover, when passing upon a motion for summary judgment under Super. R. Civ. P. 56, if no genuine issues of material fact exist, the trial justice may determine whether the moving party "is entitled to judgment as a matter of law." Lynch v. SpiritRent-A-Car, Inc., 965 A.2d 417, 424 (R.I. 2009). Only when the trial justice is satisfied that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law may summary judgment be properly entered. TangleridgeDev. Corp. v. Joslin, 570 A.2d 1109, 1111 (R.I. 1990).
 II ANALYSIS
To decide the Parties' cross-motions for summary judgment, the Court must first determine whether the 1993 Contract is binding on the Town despite the Town Council's failure to ratify it. Then, assuming the Court finds the 1993 Contract is valid, the Court must decide whether it was preempted by subsequent CBAs including the properly ratified 2001-2004 and 2005-2008 CBAs, which as Johnston asserts, provide the only disability pension benefits to which Plaintiffs are entitled. *Page 10 
 A Validity of the 1993 Contract
In support of its Motion for Summary Judgment, Johnston argues that the 1993 Contract is unenforceable because the Town Council never approved of it. Johnston maintains that under the Charter, the 1993 Contract could only be binding against the Town if 1) it was recommended to the Town Council from the pension committee called for by the governing CBA, and 2) either the Town Council gave Mayor aRusso prior authority to enter into the 1993 Contract or the Contract was later ratified once it was signed by Mayor aRusso. Inexplicably, neither of these three took place. In support of its argument that only the Town Council's approval could bind the Town, Johnston points to § 1-3 of the Charter, which states that so long as state law and the Charter itself do not otherwise provide, the Town enjoys "all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever." CHARTER, § 1-3 (1982). In addition, the Charter explicitly vests "all the powers of the town" in the Town Council and declares the Town Council the "policy determining body." CHARTER, § 3-8 (1982). By virtue of this, the Mayor may only negotiate contracts "on behalf of the [T]own with the approval ofthe [T]own [C]ouncil." CHARTER, § 4-6-6 (1982) (emphasis added). Thus, Johnston argues that Mayor aRusso's representations to the IBOP and his signature on the 1993 Contract are meaningless in the absence of the Town Council's approval, and thus the 1993 Contract is unenforceable.
The language of a town charter is interpreted according to the rules of statutory construction, and where a charter's provisions are clear and unambiguous "the court must interpret it literally, giving the words . . . their plain and ordinary meanings." Stewart v. Sheppard, *Page 11 885 A.2d 715, 720 (R.I. 2005) (citing Labor Ready Northeast,Inc. v. McConaghy, 849 A.2d 340, 345 (R.I. 2004)). The Charter before the Court is clear with regard to the mayor's authority to enter into contracts. He or she may do so only with the "approval" of the Town Council. In this instance, there is no evidence that formal approval was ever given, and accordingly the Court can only conclude that the Charter provisions stated above were not observed.
The Court's consideration of the 1993 Contract, however, does not end here. Plaintiffs accept that Mayor aRusso did not have actual authority to enter into the 1993 Contract on the Town's behalf. Despite this, however, Plaintiffs claim the Town is estopped from denying the 1993 Contract's validity. They argue that the Town Council's practice of approving annual budgets and allocating funds in a manner consistent with provisions of un-ratified CBAs as well as the un-ratified 1993 Contract, demonstrated to the IBOP that implicit approval through appropriations rather than formal voting was the Council's procedure of choice for entering into contracts. Examples of the Town's behavior include the fact that since 1993 the Town has made its requisite twelve (12) percent contributions into the ING Accounts as specified in the 1993 Contract. Given that no CBAs or other agreements besides the 1993 Contract have required the Town to do this, Plaintiffs question why the Town would make these contributions when, absent the 1993 Contract, the Town had no obligation to do so. A second example is the Town Council's commissioning of a 2002 review of the "police pension fund," which was performed by an outside consulting firm, Hooker Holocombe, Inc. (hereinafter "Firm"). In its report, the Firm stated that its review was based "on a plan document that *Page 12 
was signed October 25, 1993."[11] They further question why the Town would hold the 1993 Contract out to the Firm as its pension plan if, as the Town argues, the 1993 Contract was not valid. Indeed, the Court questions this as well.
Relief under the doctrine of equitable estoppel against a municipality is "extraordinary and will not be applied unless the equities clearly must be balanced in favor of the parties seeking relief . . ." Greenwich Bay Yacht Basin Ass'n v. Brown,537 A.2d 988, 991 (R.I. 1988). Since a municipality's obligation to pay damages under this doctrine is almost always born by taxpayers, courts are sensitive to "the public interests that might have to be weighed against equitable entitlement. . ." Id.; See alsoNewport Hosp. v. Ward, 56 R.I. 45, 183 A. 571, 577 (R.I. 1936) (noting "[t]he protection of [municipalities] from the unauthorized acts of its officers and agents is a matter in which the whole community is concerned."). Therefore, in addition to the general estoppel standard, estoppel against a municipality requires that the aggrieved party either acted or refrained from acting in reliance upon the representations of a municipal agent acting within his or her actual authority. Ferrelli v. Dept. of EmploymentSec.,106 R.I. 588, 594, 261 A.2d 906, 910 (R.I. 1970) (emphasis added);Sch. Comm. of Providence v. Bd. of Regents for Educ.,429 A.2d 1297, 1302 (R.I. 1981) (stating "any representation made by such an agent lacking actual authority are not binding on the municipality"); Romano v. Ret. Bd. of the Employees' Ret.Sys., 767 A.2d 35, 39 (R.I. 2001) (recognizing that courts do not "give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis of a contract or an estoppel") (internal citations omitted). *Page 13 
The threshold issue, therefore, is whether the IBOP, when entering into the 1993 Contract, relied on representations from an agent of the Town with actual authority. While the Court agrees with Johnston that Mayor aRusso did not have actual authority to enter into the 1993 Contract, the Court also recognizes that it was not just Mayor aRusso's representations that induced the fflOP to enter into the 1993 Contract but also the actions, or lack thereof, of the Town Council, which at all times did possess the actual authority to bind the Town. In general, estoppel against a municipality has been denied where an agent's actions were either in contravention of state law or municipal ordinances or otherwise at odds with explicit or implicit municipal policies. See El Marocco Club,Inc. v. Richardson, 746 A.2d 1228, 1234 (R.I. 2000) (finding town council was not estopped from passing and enforcing new regulations that substantially interfered with plaintiffs business, which he had expanded in reliance on assurances that the new regulations would not be passed); Tidewater Realty, LLC v. State,942 A.2d 986, 995 (R.I. 2008) (stating that prior representations by the town did not estop it from exercising its right of first refusal with regard to a sale of land because that right was specifically granted by state law and could not be waived); Betz v.Paolino, 605 A.2d 837, 839-40 (R.I. 1992) (denying estoppel against city because retirement board did not have authority to grant additional benefits beyond that provided for by city legislation); Romano, 767 A.2d at 39-40 (denying state pension board was estopped from suspending plaintiffs benefits when plaintiff had relied on representations by pension board officials because those representations were inconsistent with state law).
Here, the Town Council did have authority to ratify the 1993 Contract, as it did the ING Accounts in 1984 as well as the numerous non-ratified CBAs. Its silent *Page 14 
acquiescence to the actions of Mayor aRusso by annually appropriating funds to meet the twelve (12) percent obligation imposed by the 1993 Contract as well as its affirmative action in commissioning the 2002 study evaluating the ING Accounts as constituted under the 1993 Contract provisions can only be interpreted as a subsequent ratification of the 1993 Contract. In Murphy v. Duffy, the Supreme Court barred the West Warwick School Committee from reneging on a construction contract when despite not ratifying the contract, the Committee took affirmative steps in furtherance thereof such as procuring the contractor's services, allowing him and his employees access to school grounds to begin construction, and keeping track of the significant progress made by the contractor without objecting. 46 R.I. 210, 124 A. 103, 104-05 (R.I. 1922). In explaining its decision, the Court stated:
 "[T]he conduct of the school committee by its acquiescence, its silence, when there was the imperative duty to speak, amounts to an approval; and, after he has expended large sums of money in reliance upon the reasonable interpretation of the conduct of the school committee, this complainant should not be allowed to [use the] lack of a formal or even an actual approval of the location of said schoolrooms [to bar the contract]. To permit that would be to aid in the perpetration of an injustice." Id. 46 R.I. 210, 124 A. 103 at 108.
Similarly, in Shiavulli v. School Committee of NorthProvidence where a teacher had taken leave without formal approval, the Supreme Court estopped the North Providence School Committee from denying her a new assignment upon her return. 114 R.I. 443, 450, 334 A.2d 416, 420 (R.I. 1975). The Court found that in addition to the superintendent's assurances that he would present her request to the school committee, the committee's subsequent silence provided a reasonable basis for the teacher to assume her request had been approved. Id. In reaching its opinion, the Court noted that it was *Page 15 
within the committee's power to either approve or reject the teacher's request and stated that:
 "[s]ilence can be the basis for estoppel where there exists a duty not to remain silent as where the circumstances require one to speak lest such silence would reasonably mislead another to rely thereon to his detriment." Id. 114 R.I. at 449-50, 334 A.2d at 419.
Here, it was not just the representations of Mayor aRusso upon which the IBOP relied when executing the 1993 Contract but also the Town Council's silence and subsequent conduct which implied ratification. Since 1993, the Town was aware that plan participants like the Plaintiffs were making their six (6) percent contributions as required by the 1993 Contract. Thus, if the Town Council objected to Mayor aRusso's signing of the 1993 Contract, it had a duty to make its rejection known then, not almost eighteen years after the fact.
Because the Court has determined that the IBOP relied on the passive conduct of the Town Council, which had actual authority to bind the Town, rather than Mayor aRusso's representations, the Court further finds ample evidence to support Plaintiffs' claim for estoppel. The Town Council's behavior in no way suggested to the IBOP that the 1993 Contract would be treated any differently from the numerous contracts adhered to before and after. Further, from that point forward, the Town Council authorized contributions to participant ING Accounts pursuant to the terms of the 1993 Contract. Thus, the IBOP reasonably relied on the Town Council's past and current practices, and plan participants like Plaintiffs suffered a detriment in so doing. Since 1993, Plaintiffs contributed six (6) percent of their pay on the promise that they would receive distributions from the ING Accounts upon retirement or other triggering event. The 1993 *Page 16 
Contract imposed the six (6) percent obligation, and absent reliance on the 1993 Contract, Plaintiffs presumably could have elected to contribute less and kept more money in their pockets. The Town of Johnston, however, has not only been able to retain and attract officers through its benefits plan but has also been able to keep Plaintiffs' six (6) percent contributions as an "asset" of the Town.[12] The Court finds here that the doctrine of estoppel, even against a municipality, "should be available . . . where great injustice or loss would result." Ferrelli,106 R.I. at 592, 261 A.2d at 909. To allow Johnston to deny the validity of the 1993 Contract when for over a decade its actions have suggested otherwise would not only create a windfall for the Town but a significant loss to Plaintiffs. Accordingly, Johnston is estopped, and the 1993 Contract is a binding agreement.
 B Relationship Between 1993 Contract and CBAs
Defendant Johnston also argues that regardless of the Court's findings with regard to the 1993 Contract, the 2001-2004 and 2005-2008 CBAs' disability pension provisions[13]
provide the exclusive retirement benefits to which Plaintiffs are entitled. Because the 2001-2004 and 2005-2008 CBAs are the only contracts between the Town and the IBOP that were formally ratified by the Town Council, the Town asserts that the CBAs supersede any prior agreements the Parties may have entered into. Not only are *Page 17 
references to deferred compensation plans absent from both CBAs, but the 2005-2008 CBA[14] also added:
 "In the event any pension plan document, pension trust document or any other pension document conflicts with the provisions of this Agreement, the language of this Agreement controls and supersedes any language which is inconsistent or may be construed as inconsistent regarding the pension plan." 2005-2008 CBA Art. XIV § 1 ¶ 2.
Given that the 1993 Contract itself is entitled "Town of Johnston Police Department Pension Plan," Johnston argues that it clearly falls within the language of the above cited section and is therefore preempted by the CBA terms.
In addition, the Town argues that it has consistently held out to police that their pensions are governed solely by relevant CBA provisions, which provide for a defined benefit plan. By definition, defined benefit plans provide benefits to retirees over the course of their lifetimes, and thus it would make no sense to also offer distributions from a deferred compensation plan.[15] Despite being labeled and managed by ING as deferred compensation accounts, Johnston claims it has always referred to the ING Accounts as its pension plan and that ING understood this. See Dep. Menard 69:15-19. Johnston asserts that rather than an additional benefit, the ING Accounts are merely a funding mechanism for paying the CBA pensions. While the town acknowledges that using a deferred *Page 18 
compensation plan to fund a defined benefit plan is uncommon, it points to Menard's testimony that such an arrangement is possible.See id at 87:7-18.
According to Mr. Robert Civetti, an independent certified public accountant who since 1994 has audited Johnston's financial statements, it has been the practice of Johnston to pay its pensions out of the Town's General Fund which is driven by tax revenues. Dep. Civetti, 48:23-50:18 (March 29, 2011). In recent years, the Town has also paid CBA pensions with funds from an investment account earmarked "Pension Trust Fund." This investment account was originally established with monies from the Town General Fund. Id. While Plaintiffs harp on this practice to refute Johnston's claim that the ING Accounts fund the defined pension plans, Johnston argues that the ING Accounts indirectly fund the CBA pensions because they serve as a credit to offset the pension payments made out of the General Fund and the investment account. Johnston asserts that there is no requirement in the CBAs or elsewhere that pensions be paid directly from the ING Accounts, and how it chooses to meet its obligations is completely within its own discretion.
Plaintiffs respond that the ING Accounts have nothing to do with funding the defined pension plans under the CBAs and are in fact deferred compensation plans as represented to them in 1984 when the ING Accounts were established. They note that financial statements, contracts between Johnston and ING, as well as the participant enrollment forms all refer to the ING Accounts as 457 deferred compensation plans. See Dep. Civetti 40:18-41:15; Dep. Menard 24:20-23. According to Plaintiffs, Mr. Civetti brought to the Town Council's attention these discrepancies as well as the unorthodox practice of paying defined benefit pensions while also funding the ING Accounts as if *Page 19 
they were deferred compensation plans. Dep. Civetti 58:14-25. Additionally, Plaintiffs point to Ms. Menard's deposition testimony where she states that she has never heard of a municipality funding defined pension plans through deferred compensation accounts. Dep. Menard, 45:4-22. Lastly, Plaintiffs ask how the ING Accounts can be used to fund defined benefit pensions when enrollment in the ING Accounts was voluntary and participants have had the autonomy to direct where and how their accounts were to be invested. See Id. at 38:4-12; Dep. Faella 51:1-15 (April 25, 2011). Such a strategy, according to Plaintiffs, makes no sense if participants are already guaranteed a set pension amount.
Plaintiffs also contend that the CBA language does not supersede the prior 1993 Contract. Until the 2005-2008 CBA, there was no agreement absent the 1993 Contract that compelled participants to contribute a fixed percentage to their ING Accounts, and to this day there is no CBA language requiring Johnston to contribute its twelve (12) percent.[16] Yet the Town has made those contributions on a continuing basis as required by the 1993 Contract. Plaintiffs further point to CBA language concerning early retirement which provides that participants who leave after one to ten years of service may "withdraw from the retirement fund his or her six (6) percent contribution as well as the Town's twelve (12) percent into the fund, for a total of eighteen (18) percent." 2001-2004 
2005-2008 CBAs Art. XIV § 3(a). A subsequent provision gives participants who leave with between ten and eighteen years of service the option of receiving a lump sum of their six (6) percent and the Town's twelve (12) percent contributions, or "to leave his/her retirement intact, not withdrawing any amount until that amount has been in *Page 20 
for a period of twenty (20) years, then that employee will receive a pension beginning the 21st year. . . ."Id. at Art. XIV § 3(c). Plaintiffs argue that but for the 1993 Contract, the CBAs' references to six (6) percent employee and twelve (12) percent employer contributions have no meaning. Further, absent the 1993 Contract, there is no governing document for how these contributions are made, where they are placed, and whether police officers have any role in their management. Thus, rather than being preemptory, Plaintiffs argue that, in fact the CBA provisions rely on the 1993 Contract to give them their full effect.
In deciding whether the 1993 Contract is preempted, the Court must determine whether the Parties intended to make the defined pension benefit plans under the CBAs the only retirement benefit to which retirees would be entitled. As a preliminary matter, the Court recognizes that the Supreme Court acknowledges the "parallels between our system of labor regulations and the federal system" and finds federal law in this area to be persuasive authority.Western Lodge no. 10 v. Town of Westerly,659 A.2d 1104, 1105 (R.I. 1995). In that vein, the Court follows the recognized practice of interpreting provisions of collective bargaining agreements in the light of "traditional rules of contract interpretation." United Steel Workers v. Newman-Crosby Steel,Inc., 822 F. Supp. 862, 865 (D.R.I. 1993). Accordingly, the Court must look first to the CBAs "in [their] entirety and [their] language given its plain, ordinary and usual meaning."Paradis v. Greater Providence Deposit Corp. et al.,651 A.2d 738, 741 (R.I. 1994). If on their own, the Court finds their language unambiguously preempts that of the 1993 Contract, the CBAs must be enforced as written. Aetna Casualty SuretyCo. v. Graziano, 587 A.2d 916, 917 (R.I. 1991). Under this standard, a CBA is ambiguous if "the language can support a *Page 21 
reasonable difference of opinion as to the meaning of the words used and the obligations undertaken." Casey v. LifespanCorporation, 62 F. Supp. 2d 471, 480 (D.R.I. 1999). Thus, if there is a question as to whether the CBAs and the 1993 Contract do or do not coexist, the Court must go beyond the four corners of the CBAs and attempt to ascertain the Parties' intent through examination of extrinsic evidence. Lennon v. MacGregor etal., 423 A.2d 820, 822 (1980). Only if the Parties' intent is still not clear after considering the pleadings, discovery materials, and affidavits does "a genuine issue of material fact exist[], which [therefore] cannot be resolved upon a motion for summary judgment." Id.
A plain reading of both CBAs' Art. XIV shows that the Town provides its police a defined pension benefit plan. Absent from both CBAs is any direct reference to deferred compensation benefits. In addition, § 1 ¶ 2 of this Article in the 2005-2008 CBA purports to invalidate any pension document that "conflicts with" or is "inconsistent" with the defined benefit plan of the CBA. Keeping both of these references in mind, the Court still finds that neither CBA sufficiently addresses the extent to which the 1993 Contract is preempted. With regard to the lack of reference to the ING Accounts in the language of the CBAs, the Court notes that deferred compensation and defined benefit plans are fundamentally different pension systems. In one, an employee directly participates in its success or failure, and the amount he or she eventually receives is not guaranteed. In the other, an employee has no role in investment decisions, and his or her benefit is a guaranteed amount calculated by a formula rather than an investment amount. It is not uncommon for both plans to coexist as a comprehensive retirement plan.See Dep. Rodio 44:15-44:23, 51:3-8 (April 26, 2011); Dep. Menard 52:14-24. See also In re *Page 22 Almeida, 611 A.2d 1375, 1385-86 (R.I. 1992) (discussing contractual (deferred compensation) versus gratuitous (defined benefit) theories of pensions and finding most plans are a mixture of both). A clear example of this is Johnston itself, which currently offers its police officers both a pension plan under the current CBA as well a separate deferred compensation plan, separate and apart from the ING Accounts at issue in this matter. See Dep. Rodio 51:3-11. Thus, it is unclear from an exclusive reading of the numerous CBAs while giving their provisions their plain and ordinary meaning, that any language in any CBA actually conflicts or is otherwise inconsistent with 1993 Contract.
In addition, there is no language specifically addressing preemption, nor is there language in the CBAs referring to the ING Accounts as a funding mechanism for the defined pension plans as argued by the Town. There is, however, an ambiguous reference to six (6) percent employee and twelve (12) percent employer contributions to an account referred to solely as the "retirement fund." See § 3(A)-(C) of both CBAs. Unlike the extensive provisions for the CBA defined benefit plans, there is no further definition or explanation as to the terms of these contributions. This absence suggests that their terms may be provided for elsewhere, an inference that is consistent with established principles of contract interpretation. See
11 Lord, Williston on Contracts § 30:26 (4th ed.) (stating "[w]here the words employed to express some particular term of a contract are ambiguous and cannot be satisfactorily explained by reference to other parts of the contract and the parties have made other contracts in respect of the same subject matter . . . [and] general purpose, it is . . . permissible to examine all of them together . . . [to interpret] that particular term."); Seealso Int'l Org. Master, Mates and Pilots of America Local No. 2 v.Int'l Org. Master, Mates and Pilots of America, Inc.,439 A.2d 621, 625 (Pa. 1981) *Page 23 
(finding the term "normal" with regard to required monthly payments in a consent decree could not be understood except within the provisions of union pension agreements). Given the lack of clarity and ambiguity contained in the CBAs, the Court finds that, on their own, the CBAs are susceptible to multiple reasonable interpretations, namely, that they either do or do not supersede the 1993 Contract. Thus the Court will look to extrinsic evidence in an attempt to clarify these deficiencies.
When interpreting the terms of an ambiguous collective bargaining agreement, it is necessary for a court to "consider the scope of other related collective bargaining agreements, as well as the practice, usage and customs pertaining to such agreements."Senior v. NSTAR Electric and Gas Corp.,499 F.3d 206, 220 (1st Cir. 2006) (quoting Transp.-Comm'cn.Employees Union v. Union Pac. R.R., 385 U.S. 157, 161 (1966)) (internal citations omitted); see also Newman-Crosby Steel,Inc., 822 F. Supp. at 865-66 (basing interpretation of benefits agreement on 1) brochures advertising the benefit plans, 2) manner in which corporation relied on relevant benefit language in the past, 3) key omissions from the agreement, 4) information relayed to employees, and 5) the court's general understanding of public policy principles governing pensions). In this matter, the Court finds ample extrinsic evidence to indicate the Parties did not intend for the CBA defined benefit plan to replace the deferred compensation accounts. It is the Court's view that the evidence clearly shows that both plans are to exist side by side as two components of one comprehensive retirement scheme.
The Court first notes that at the time the 1993 Contract was signed, the 1993-1995 CBA also provided a defined pension benefit plan to retired officers. Thus, it would seem that at least in the beginning, the Parties understood that retirees would be eligible *Page 24 
for both plans. See Lifespan Corp.,62 F. Supp. 2d at 481 (noting that courts may consider "prior interpretations of [a] contract and the conduct of the parties that may bear upon that interpretation."). When Plaintiffs first entered into the ING Accounts in 1985, they were told by an Aetna representative at the time, Mr. Frank Rotondo, that their participation in the plan would make them very wealthy upon retirement. See Dep. Faella, 19-20; Dep. Ross 19:10-18 (Apr. 5, 2011). Given that Plaintiffs already had pensions under the 1983-1985 CBAs, this statement suggests that participation in the ING Accounts would, in fact, result in additional amounts over and above those guaranteed under the CBAs. It is further significant that nowhere in the CBAs does it state that the defined pension plans are the only benefits to which retirees are entitled. The Town was well aware of this omission, [17] yet it never inserted the few words necessary to make clear that retirees were only to receive the defined benefit plans.
The Court further finds that both CBAs' references to contributions into a "pension fund" without any explanation as to what these contributions are or how they are governed confirms the idea that the two documents cannot be understood without reference to the other. See Int'l Org. Master, Mates and Pilots of America,Inc., 439 A.2d at 625. It cannot be ignored that the Parties have consistently acted in accord with the 1993 Contract, both in making contributions and allowing participants to elect how and where their contributions are to be invested. Given this, the Court finds that the 1993 Contract is, in fact, a wholly separate agreement upon which the 2001-2004 and 2005-2008 CBAs rely because neither may be fully understood without reference to the provisions of the 1993 Contract. *Page 25 
Lastly, the Court dismisses Johnston's assertions that the ING Accounts are actually funding mechanisms for the CBA defined pension benefit plans. Regardless of how Johnston may have characterized the ING Accounts to ING, it is undisputed that to this day amounts have not been withdrawn from the ING Accounts to fund the defined pension plans under the CBAs. In addition, the Court notes that Ms. Menard is aware of specific occasions in which participants have withdrawn funds from their accounts upon triggering events other than retirement, [18] and the Court has already discussed the ability of participants to decide where and how their accounts were invested. The Court cannot comprehend why plan participants would have such autonomy over what Johnston argues are exclusively Town assets purportedly intended to pay Town liabilities. The Court further cannot comprehend what incentive plan participants would have in making sound investment decisions with the ING Accounts when upon retirement, their sole benefit is a set, formula driven, pension payment. The Court therefore finds that the deferred compensation and defined benefit plans are co-existing agreements and that the CBAs do not preempt the distributions guaranteed to Plaintiffs by the 1993 Contract.
 III Conclusion
After due consideration of all the evidence and memoranda together with the arguments advanced by counsel at the September 9, 2011 hearing, the Court finds that the 1993 Contract governing the police deferred compensation plans is binding upon the Town of Johnston and that it is not preempted by the defined pension plans contained in *Page 26 
the CBAs. Plaintiffs are entitled to distributions from amounts contained in the ING deferred compensation sub-accounts in accordance with Art. XI § 6.3 of the 1993 Contract. Accordingly, Johnston's Motion for Summary Judgment is denied, and Plaintiffs' Cross-Motion for Summary Judgment is granted.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] DiMaio retired in 2004, Faella in 2007, and Ross in 2008.
[2] DiMaio retired during the 2001-2004 CBA. Faella and Ross retired during the 2005-2008 CBA.
[3] Under I.R.C. § 457(b), state and local governments may offer employees deferred compensation plans into which the employer, employee or both contribute monies. Both employee contributions from pay deductions as well as interest earned on a plan's investments are tax-deferred.
[4] Aetna Life Insurance and Annuity Company is the predecessor in interest of Defendant ING Life Insurance and Annuity Company. Hereinafter, both entities will be referred to as "ING".
[5] In general, fixed accounts earn a fixed rate of interest for a specific time period. Unlike fixed accounts, accumulation accounts offer participants a range of investments options, but returns are tied to the performance of underlying investments. Because of the added risk, some accumulation accounts, including those at issue here, provide a minimal guaranteed interest rate. Accumulation accounts are only distributed upon occurrence of a specific event such as death, disability or retirement. See U.S. SECURITIES AND EXCHANGE COMMISSION, VARIABLE ANNUITIES: WHAT YOU SHOULD KNOW (2011) available at
http://www.sec.gov/investor/pubs/varannty.htm.
[6] According to Ms. Menard, ING's current Account Manager for Johnston, an employer is listed as the account owner because for tax purposes the employee has not yet been paid the amount deferred, therefore he or she does not own the funds contained in their accounts until withdrawal. Dep. Menard 35:5-36:6.
[7] According to Plaintiff Ross' 8/15/11 Objection to Johnston's Motion for Summary Judgment, the fourteen CBA's are dated: 1983-1985; 1985-1986; 1986-1987; 1987-1988; 1989-1990; 1990-1991; 1992-1993; 1993-1995; 1995-1998; 1998-2001; 2001-2004; 2005-2008. Ross Objection at 3 fn. 2.
[8] Sample language from successive iterations of the Pension Committee sections included: "The Town agrees to review and revise the pension plan for the Police Department, and appoint a Board of Governors . . ."1993-1995 CBA Art. XV, § 1; "The Town and [IBOP] hereby agree that a comprehensive review of the pension plan for the Police Department is necessary and hereby agree to create a study commission. . . ." 2001-2004 CBA Art. XIV § 1; "This pension committee is advisory only." 2005-2008 CBA Art. XIV § 1.
[9] According to current Johnston Town Clerk, Vincent Baccari, Jr., after an exhaustive search of town records, evidence of ratification for virtually all documents at issue in this case with the exception of the 2001-2004 and 2005-2008 CBAs do not exist.See Dep. of Baccari, 10:25-14:17 (April 29, 2011).
[10] By stipulation of the Parties, counts against both Defendant ING and Defendant Citigroup were dismissed without prejudice.
[11] Town of Johnston, Rhode Island: Review of the PoliceDepartment Pension Plan, Hooker Holocombe, Inc., Ex. II, P. 14 (2002).
[12] See Dep. Robert Civetti, 88:11-89:2.
[13] 2001-2004 CBA Art. XIV § 4; 2005-2008 CBA Art. XIV § 4.
[14] The Court is aware that Plaintiff DiMaio's retirement preceded the 2005-2008 CBA, but given the Court's reasoning in reaching its ultimate decision, it is unnecessary for it to decide whether the language the 2005-2008 CBA impacts the determination of his benefits.
[15] In contrast to a deferred compensation plan where an employee's earnings are predicated on investment results, payments from a defined benefit plan are fixed by a set formula and guaranteed over the course of an employee's lifetime. Dep. Menard, 18:12-20:8.
[16] See Dep. Joseph J. Rodio, Sr., 27:5-19; 30:6-21.
[17] Dep. Civetti, 40:2-22.
[18] Menard stated that to her knowledge, ING has received at least four requests during her tenure from participants to withdraw their funds due the occurrence of a triggering event other than retirement, including domestic relations matters and emergency situations. Dep. Menard 56:21-58:23, 60:13-62:23; 63:6-23, 66:7-67:17. *Page 1